UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
AIOI INSURANCE COMPANY, as subrogee and
assignee of YAZAKI NORTH AMERICA, INC.

                 Plaintiff(s),

        v.

TIMELY INTEGRATED, INC.

                 Defendant(s).

-----------------------------------------------------------X

CIVIL ACTION NO.: 1:08-cv-01479-TPG

**AFFIRMATION OF ERIC B. SCHOENFELD, ESQ. IN SUPPORT OF MOTION FOR LEAVE TO FILE THIRD-PARTY INTERVENOR COMPLAINT**

    ERIC B. SCHOENFELD an attorney duly admitted to practice law before the Courts of the State of New York hereby affirms the truth of the following under penalties of perjury:

1.    I am a member of the law firm of SCHOENFELD MORELAND, P.C., attorneys for putative third-party plaintiff, LUCKY 7 TRANSPORTATION in the above-entitled action. As such, I am fully familiar with the facts and circumstances of this action.

2.    The facts giving rise to this litigation begin with a shipment of wire harnesses which plaintiff YAZAKI NORTH AMERICA, INC. (hereinafter referred to as "Yazaki") contracted to have delivered in 2006. On or about December 8, 2006, YAZAKI contracted with TIMELY INTEGRATED, INC. to have approximately 1,500 wire harnesses delivered from YAZAKI's facility in El Paso, Texas to a YAZAKI facility in Edwardsville, Illinois. These wire harnesses were shipped in approximately 51 containers.

3.    The relationship between YAZAKI and TIMELY INTEGRATED was evidently governed by a Motor Carrier Agreement between YAZAKI and TIMELY INTEGRATED. This Motor Carrier Agreement was entered into in approximately October of 2005 and memorializes certain terms between the parties as to TIMELY's "transportation" on behalf of YAZAKI, which would by its terms include the shipment of the wire harnesses which are the subject of this lawsuit. (See copy of Motor Carrier Agreement between YAZAKI and TIMELY INTEGRATED, attached as Exhibit "A").

4.    Upon information and belief, TIMELY INTEGRATED is a freight broker.

5.    The Motor Carrier Agreement between YAZAKI and TIMELY INTEGRATED provides in Paragraph 7 that any cargo shipped by YAZAKI or YAZAKI's affiliates shall be "presumed damaged . . . if while in Carrier's (TIMELY's) posession and control (and through no fault of YAZAKI or YAZAKI's affiliates): (i) the cargo has been exposed to moisture; (ii) cargo has been separated from its original packaging or carton; or (iii) the cargo has been stacked in a manner inconsistent with the written loading instructions provided to the Carrier by YAZAKI or YAZAKI's affiliates." (See Exhibit "A").

6.    On August 16, 2006, a company by the name of "Integrated Carrier Services" entered into a Contract of Carriage Transportation Agreement with putative third-party plaintiff LUCKY 7 TRANSPORTATION, whereby LUCKY 7 agreed to act as the motor carrier to perform delivery of cargo/loads brokered by TIMELY INTEGRATED.  Upon information and belief, "Integrated Carrier Services" and TIMELY INTEGRATED are affiliated companies.  (See copy of Contract of Carriage Transportation Agreement, attached hereto as Exhibit "B").

7.    The aforesaid Contract of Carriage Transportation Agreement provided that LUCKY 7 TRANSPORATION shall be liable to Integrated or Integrated's customers for the owner of the property for "loss or damage to such property while in the possession of or under control of LUCKY 7, subject to the application of the Carmack Amendment." The Agreement additionally provides that in no event shall either party be liable for "special, indirect, punitive or consequential damages incurred by the other party," even if the non-incurring party has notice of such damages. (See Exhibit "B").

8.    At some point prior to December 8, 2006, Integrated Carrier Services and/or TIMELY INTEGRATED retained LUCKY 7 TRANSPORTATION to transport the aforesaid cargo of wire harnesses. This transportation was performed pursuant to the terms of a Bill of Lading. (See copy of Bill of Lading, attached hereto as Exhibit "C").

9.    Upon information and belief, LUCKY 7 TRANSPORTATION picked up the subject-matter cargo from YAZAKI in El Paso, Texas on December 8, 2006 for delivery to YAZAKI's facility in Edwardsville, Illinois. This cargo was being transported via a 1998 Freightliner tractor trailer being operated by driver Rosalba Lopez Quintero. Upon information and belief, while rounding a sharp curve on FM 707 in Jones County, Texas, the vehicle overturned into a ditch, causing damage to the trailer.

10.    Thereafter, upon information and belief, a wrecker service was called to the scene of the

accident to reload the cargo into another trailer.

11.    Thereafter, the cargo in question was delivered to YAZAKI's Edwardsville, Illinois facility on or about December 22, 2006. There are several copies of the Bill of Lading in question, one of which is executed with no exceptions. (See copies of Bills of Lading, attached as Exhibit "C").

12.    The cargo in question was apparently not inspected at the time it was signed for and custody and control taken of the cargo by YAZAKI. YAZAKI thereafter retained a surveyor, Atlantic Marine Inspections. The report from Atlantic Marine Inspections dated May 2, 2007 details that YAZAKI did not wish to unload the trailer and inspect its contents until the surveyor could be present to attend the unloading and document any damage to the wire harnesses. (See report of Atlantic Marine Inspections dated May 2, 2007, attached as Exhibit "D").

13.    The report of Atlantic Marine Inspections sets forth that the shipment was delivered and signed for on December 22, 2007 and that exceptions were in fact noted on the Bill of Lading indicating "wrecked load, Seal 196232 no seal on load."   Once again, it should be noted that there are several "versions" of the aforesaid Bill of Lading, one which contains these exceptions and one which is signed without exception  (See Exhibit "C").

14.    The report of Atlantic Marine additionally goes on to detail the efforts made by the representatives of Atlantic Marine to actually make arrangements for the offloading and inspection of the cargo. Specifically, the report states that Atlantic Marine first contacted Mike Soper of YAZAKI to arrange for the inspection and Soper thereafter advised Atlantic Marine to contact Dawn Bolke, identified as Senior Manager of Logistics for YAZAKI. It is stated in Atlantic Marine's report that several voicemail messages were left for Ms. Bolke and she never returned their calls. After attempting on several other occasions to contact YAZAKI to arrange for the inspection, the report of Atlantic Marine sets forth that the aforesaid offloading and inspection was subsequently conducted on January 10, 2007, some 19 days after the trailer was delivered and the load was accepted by YAZAKI. Therefore, the load was in YAZAKI's possession for 19 days before Atlantic Marine viewed its contents. (See Exhibit "D").

15.    The report of Atlantic Marine indicates that their inspection of the cargo demonstrated

that some of the plastic totes in which the cargo was housed was chipped and broken, some of the cardboard spacers appeared to be "wet and discolored" and that one of the harnesses appeared to be "frayed from abrasion." (See Exhibit "D").

16.    On the basis of its "detailed inspection" Atlantic Marine opined that it was estimated that approximately 60 to 70 percent of the harnesses sustained damage and that the "operable integrity" was "questionable." The report of Atlantic Marine then states that upon completion of the inspection, Matt Ellinghausen, Parts Control Supervisor at YAZAKI, indicated that the only course of action to be taken to mitigate the loss was to return the harnesses to the factory to determine if they were "serviceable" and/or to scrap the entire load "to prevent potential vehicle electrical problems," as these wire harnesses were in fact to be installed into automobiles. The report further states that Ellinghausen stated that YAZAKI's Edwardsville facility was not equipped to test the harnesses and that if they were going to be tested, they would need to be shipped to YAZAKI's "other facility." The report goes on to state that in further conversations with Ellinghausen, he advised that YAZAKI's quality control personnel indicated that the wiring harnesses were exposed to elements out of their control and "sustained damage" and that as a result, the decision of YAZAKI was that it did not wish to attempt to test or utilize any of the harnesses and the entire load was therefore discarded as scrap. (See Exhibit "D").

17.    Upon information and belief, no one from LUCKY 7 TRANSPORTATION was ever contacted and advised that this load was to be scrapped, nor was LUCKY 7 TRANSPORTATION ever advised that the load was rejected due to damage.

18.    YAZAKI's counsel subsequently forwarded a notice of intention to make a claim for approximately $98,015.69, representing the alleged value of the load in question. The initial notice was dated August 7, 2007 and was directed to TIMELY INTEGRATED. Notice was subsequently separately forwarded to Penobscot Group, third-party administrator for Certain Underwriters at Lloyd's, London, the cargo insurer for LUCKY 7 TRANSPORTATION. This separate notice was dated October 10, 2007.

19.    Thereafter, on or about February 13, 2008, AIOI INSURANCE COMPANY, as subrogee and assignee of YAZAKI NORTH AMERICA, INC. filed the complaint which is the subject of the within lawsuit. This complaint is filed against TIMELY INTEGRATED only and alleges

TIMELY's gross negligence in the care of the cargo and alleges that TIMELY INTEGRATED breached its duty of care in failing to properly deliver the merchandise and in failing to properly supervise its employees, subagents or contractors. The second cause of action alleges breach of contract between YAZAKI and TIMELY in that it is alleged that "[TIMELY] and [YAZAKI] by contract agreed to the type of damages for which defendant would be liable." It is alleged that [YAZAKI's] merchandise was in possession and in control of TIMELY and was exposed to moisture, became separated from its packaging and was stacked inconsistent with the instruction. The third cause of action is breach of statutory duties under the Carmack Amendment. The demand in the complaint is for damages in the amount of $98,015.69. Putative third-party plaintiff LUCKY 7 TRANSPORTATION is not named as a party to this lawsuit.

20.    A copy of the proposed third-party plaintiff LUCKY 7 TRANSPORTATION's proposed third-party complaint is attached hereto as Exhibit "E."

Dated:      June 12, 2008
            New York, New York

                                SCHOENFELD MORELAND, P.C.
                                Attorneys for Putative Third-Party Plaintiff
                                LUCKY 7 TRANSPORTATION
                        By:     __/s/_____
                                ERIC B. SCHOENFELD (ES8532)
                                61 Broadway
                                18th Floor
                                New York, New York 10005
                                (212) 509-0500
                                Our File: PGI-3743-DN1

TO:     James F. Campise, Esq.
        Nicoletti, Hornig & Sweeney
        88 Pine Street
        7th Floor
        New York, New York 10005
        Counsel to Yazaki North America, Inc.


        Barry Neil Gutterman, Esq.
        Barry N. Gutterman & Associates, P.C.
        The Lincoln Building
        60 East 42nd Street
        46th Floor
        New York, New York 10165
        Counsel to Timely Integrated, Inc.

**EXHIBIT A**

# MOTOR CARRIER AGREEMENT

This Motor Carrier Agreement (this "Agreement") is made and entered into on this 1st day of October by and between Timely Integrated, Inc  with its principal offices at 13006 Gateway East, Ghin, Texas 79836 ("Carrier") and Yazaki North America, Inc., with its principal offices at 6801 Haggerty Road, Canton, Michigan 48187 ("YNA").

1. **Transportation Services.** Throughout the term of this Agreement, Carrier shall provide transportation services for shipments tendered to Carrier by YNA and the YNA affiliated companies identified in Exhibit A ("YNA Affiliates") on the terms and conditions set forth in this Agreement. The transportation services shall  be provided by fully trained qualified personnel in a workman-like manner and shall also comply with the service requirements set forth in Exhibit B

2. **Rates.** The rates for all shipments made by Carrier for YNA and YNA Affiliates are set forth in Exhibit C. Any previous rate agreements between Carrier and YNA and/or YNA Affiliates are hereby cancelled. The rates set forth in Exhibit B may not be increased during the term of this Agreement

3. **Fuel Surcharges.** Any applicable fuel surcharges for shipments made under this Agreement shall be determined as follows: See Attached Exhibit D.

4. **Invoicing and Payment Terms.** Invoices shall be issued to the YNA Affiliate identified in the Bill of Lading, who will be solely responsible for payment.  Payment shall be made within thirty days after the later of (i) receipt of invoice, or (ii) shipment.

5. **Indemnification.** Subject to the limitations of liability set forth in Section 6 below, Carrier shall indemnify, defend and hold harmless YNA and YNA Affiliates from and against all third party liabilities, claims, suits, demands, actions, fines, damages losses, costs and expenses (including reasonable attorneys' fees) arising out of or caused by Carrier's negligence, Carrier's willful misconduct or the material breach of Carrier's obligations under this Agreement

6. **Limitations on Liability.** Unless a higher degree of liability is specifically assumed in writing by an authorized representative of Carrier, Carrier's liability to YNA and YNA's Affiliates for loss, damage or injury to cargo occurring while in the possession or under the control of Carrier shall not exceed the lower of (i) 110% of the actual value of the damaged cargo, or (ii) $500,000 per truckload shipment.

7. **Damage Claims.** Any cargo shipped by YNA or YNA's Affiliates hereunder shall be presumed damaged for purposes of Section 6 above, if while in Carrier's possession and control (and through no fault of YNA or YNA's Affiliates): (i) the cargo  has been exposed to moisture; (ii) the cargo has been separated from its original packaging or carton; or (iii) the cargo has been stacked in a manner inconsistent with the written loading instructions provided to Carrier by YNA or YNA's Affiliates.

8. **Dispute Resolution Process.**

   8.1 **Dispute Resolution.** In the event of any dispute between the parties with respect to this Agreement or the services provided hereunder, either party may provide written notice to the other party of the dispute and request commencement of the dispute resolution process. Within five days after receipt of such a request, a designated project manager for each party shall meet within five (5) business days to negotiate and use commercially reasonable efforts to promptly resolve the dispute. If the dispute is not resolved by the project managers either party may give notice to the other party that the dispute must be escalated to each parties' designated senior manager or executive, who will meet within ten (10) business days to negotiate and use commercially reasonable efforts to resolve the dispute

   8.2 **Arbitration.** Any dispute that cannot be resolved through the dispute resolution process set forth above shall be settled by binding arbitration administered by the American

1

Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The parties shall share the arbitrator costs, and each party shall bear its own attorneys' fees and expenses.

9. **Insurance** During the term of this Agreement, Carrier agrees to carry and keep in full force and effect the following insurance policies, which shall at a minimum conform to the requirements prescribed by the Surface Transportation Board and applicable state regulatory agencies: (i) Cargo Liability insurance in an amount not less than $500,000 per occurrence, (ii) workers compensation and employment practices liability coverage in an amount not less than $500,000, and (iii) Comprehensive General Liability and Commercial Auto Liability insurance coverage for bodily injury and property damage, each with minimum limits of $1,000,000 and combined single limit coverage of $5,000,000. The foregoing insurance shall be purchased and maintained from an insurer with no less than an AM Best rating of A+, YNA, YNA's Affiliates, and Yazaki International Corporation shall be named as additional insured on all polices. Within ten days after the date of this Agreement and no less than once a year thereafter, Carrier shall provide YNA with a certificate of insurance evidencing the above coverages and requiring thirty (30) days' prior written notification to YNA in the event of cancellation or material modification of any of the above referenced policies.

10. **No Volume Commitment.** YNA and YNA's Affiliates level of usage of the transportation services provided by Carrier under this Agreement shall be determined by YNA and YNA's Affiliates in their sole discretion.

11. **Term** This Agreement shall remain in effect for a period of two years from the date set forth above.

12. **Conflicts with Other Terms and Conditions.** In the event of any conflict between the terms of this Agreement and the terms set forth in Carrier's bills of lading, Carrier's other shipping documentation, or any other terms proposed by Carrier, the terms of this Agreement shall control.

13. **Amendment.** This Agreement may only be amended through a writing signed by authorized representatives of YNA and Carrier.

14. **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party hereunder.

YAZAKI NORTH AMERICA, INC.

Name: _____

Title: _____

TIMELY INTEGRATED, INC

Name: _____

Title: _____

2

**EXHIBIT B**

## CONTRACT CARRIAGE TRANSPORTATION AGREEMNT

Agreement, made and entered into as of the 18 day of Aug, 2006 by and between: Lucky 7 Transportation _____(hereinafter called "CARRIER") and Integrated Carrier Services (hereinafter called "BROKER") MC 471664-B

## WITNESSETH

WHEREAS, CARRIER, is a motor CARRIER registered with the U.S. Department of Transportation under Docket No._____ (a copy of which registration is attached hereto and made a part hereof as Appendix A); and desires to furnish contract carriage motor CARRIER services to BROKER and/or its customers for the transportation of general commodities;

WHEREAS, BROKER (a motor CARRIER transportation broker) holding broker license MC _____ controls the routing and payment of its customers' freight and desires to utilize the services of CARRIER for the transportation of customer's shipments;

WHEREAS, the parties hereto expressly waive any or all rights and remedies under the ICC Termination Act for the transportation provided hereunder, pursuant to 49 U.S.C. 14101 (b) (1) that are inconsistent herewith;

WHEREAS CARRIER and BROKER expressly agree and intend that this service is designed to meet the distinct needs of BROKER and/or its customers, including but not limited to 1) a fixed schedule of rates during the term of this Agreement; (2) flexibility in negotiating rates on a daily basis to take advantage of excess equipment and the changing needs of BROKER"S customers'

NOW THEREFORE, CARRIER and BROKER mutually agree as follows:

1. BROKER agrees to tender to CARRIER, as a contract CARRIER, and CARRIER agrees to accept a minimum of one shipments during the term of this agreement.

2. CARRIER is fully qualified and adequately equipped to perform the transportation services described herein and that the CARRIER has, and will, comply with the safety regulations of the Bureau of MOTOR CARRIER Safety of the Department of Transportation, including drivers' hours of service and records thereof, driver qualification requirements and physicals, and equipment maintenance standards and reports. CARRIER warrants that it will only provide equipment that is properly maintain and clean and will not utilize equipment that has been used for hazardous waste or other unclean or noxious freight.

3. CARRIER agrees to maintain cargo insurance in the minimum amount of $100,000.00 that shall insure CARRIER'S Liability to BROKER and BROKER'S customers for loss or damage to property transported by CARRIER. The cargo insurance shall be in the form required by 49 C.F.R. 1043 for common CARRIER'S (BMC-32 endorsement), and shall have no exclusions or restrictions that would not be accepted by the Department of Transportation for a filing under the statutory requirements of the above-cited

CARRIERS Initials _____

1

section, but shall, in all respects, be identical to the cargo insurance filed by common CARRIER'S in accord with the said section, CARRIER agrees to furnish a copy of said BMC 32 Endorsement naming BROKER as an additional insured and annex said copy as Appendix B.

4.  In addition to the foregoing cargo insurance, CARRIER, prior to the commencement of operations and during the term of this Agreement, CARRIER shall carry the following insurance in form and with insurers satisfactory to BROKER:

   a) Worker's Compensation and Employer's Liability Insurance required for all states where operations are contemplated under this agreement.

   (1) Workers' Compensation as required by law; and
   (2) Employer's Liability, with a limit of not less than one hundred thousand dollars ($100,000) aggregate limit of liability, and in addition not less than one hundred thousand dollars ($100,000) aggregate limit of liability per policy year for disease, including death at any time resulting there from, not caused by accident.

   b) Commercial General Liability Insurance with a combined single limit per occurrence of not less than one million dollars.

   c) Comprehensive Automobile Liability Insurance with a combined single limit per occurrence of not less than one million dollars against liability arising form the maintenance or use of all owned, non-owned and hired vehicles.

   d) CARRIER shall furnish to BROKER written certificates obtained from the insurance CARRIER showing that such insurance has been procured, is being properly maintained, that the premiums therefore are paid, specifying the name of the insurance CARRIER, the policy number, the expiration date, and specifying that written notice of cancellation or modification of the policies shall be given to Broker at least (30) days prior to such cancellation or modification. Upon request, CARRIER shall provide BROKER with copies of the applicable insurance policies and upon request, CARRIER shall add BROKER as an additional named insured to the insurance policies. If CARRIER is authorized to be self-insured then CARRIER shall provide to BRKER evidence satisfactory to BROKER of CARRIER'S self-insured status and that CARRIER is able to provide the same coverage as that required by CARRIER'S under this Agreement that are not self-insured.

5.  CARRIER shall indemnify and hold harmless the BROKER, and its customers for all claims for injury to persons (including injury resulting in death) and damage to property arising out of or in connection with transportation of the property of the BROKER and its customers hereunder and shall procure and maintain, at the expense of the CARRIER, liability insurance with a reputable and financially responsible insurance company or companies properly insuring CARRIER against liability and claims in

CARRIERS Initials

2

accordance with the requirements of 49 C.F.R. 1043.1, and shall furnish to the BROKER a copy of a Certificate of Insurance obtained from such insurance company or companies showing that such insurance has been procured and is being properly maintained and that the premiums therefore are paid, specifying the name of the insurance company, the policy number or numbers, and the expiration date or dates. Such insurance policies shall provide that in the event of cancellation thereof written notice of such cancellation shall be given to the BROKER at least 30 days prior to such cancellation as to each policy. Such insurance policies shall name the BROKER as an "Additional insured".

6.  Rates and charges for shipments transported pursuant to this Agreement shall be as agreed to between the parties hereto in writing to this Agreement shall a schedule of rates, rules and charges attached hereto as Appendix C which schedule may be modified, in writing, from time-to-time. This schedule shall also contain the conditions of, and charges for, any additional or accessorial services that may be required or performed and it is expressly agreed that the CARRIER'S tariffs should have no application to shipments transported pursuant to this agreement.

7.  Rates may be established or amended verbally in order to meet BROKER'S changing shipping schedules and needs. BROKER shall confirm each such rate in writing by a letter or "fax" transmission to CARRIER and said document shall constitute an addendum or amendment to this Agreement.

8.  CARRIER shall issue a written delivery receipt or bill of lading for all shipments transported pursuant to this Agreement. The receipt shall show the kind, quantity and condition of commodities received and shall be evidence of receipt of such commodities by CARRIER in apparent good order and condition unless such commodities are not readily observable (contents and condition of contents of packages unknown) or as may be otherwise noted on the face of such receipt. To the extent any term or condition of such receipt or bill of lading conflicts in any way with any term or conditions of this Agreement, this Agreement shall take precedence and control resolution of disputes. In five (5) days or less subsequent to delivery of a shipment, CARRIER shall provide BROKER with a copy of said bill of lading or receipt signed by the consignee as proof of delivery of said shipment.

9.  CARRIER shall promptly bill BROKER for the freight and transportation charges on each shipment and in no event shall BROKER or its customers be required to pay for any shipment or for any service that are not invoiced with six months of the date of delivery. CARRIER shall deliver to BROKER with its billing all required documentation, including proof of delivery by the CARRIER to the consignee and proof of BROKER'S advance authorization of all other service for which payment is sought. BROKER shall pay CARRIER, as CARRIER'S agent, within 30 days after receipt by it of all

CARRIERS Initials

3

BROKER with a copy of its Federal operating authority and a certificate verifying the motor carrier liability and cargo insurance specified hereunder and BROKER'S reference number assigned to CARRIER.

10. CARRIER acknowledges that BROKER is acting as CARRIER'S agent for the purpose of collecting freight charges and CARRIER acknowledges that in no event shall it seek to collect its charges form BROKER'S customers or the consignee, consignor or beneficial owner of the freight. CARRIER shall not withhold any goods of BROKER'S customers on account of any dispute as to prices or any alleged failure of BROKER to pay charges incurred under this Agreement. CARRIER agrees that its failure to abide by this paragraph will irreparably harm BROKER'S reputation and relationship with its customers and that therefore BROKER may obtain temporary and permanent injunctive relief should CARRIER violate this paragraph.

11. CARRIER shall not solicit traffic from any shipper, consignee or customer of BROKER where (1) CARRIER'S first transportation of a shipper's freight was due to BROKER'S efforts, or (2) where the traffic of the shipper, consignee or customer of the BROKER was first tendered to the CARRIER by the BROKER. IF CARRIER breaches this agreement and "back-solicits" the BROKER'S customers, and obtains traffic from such a customer, the BROKER shall be entitled, for a period of 15 months from the termination of this Agreement, to amount equal to fifteen percent (15%) of the compensation as BROKER would have realized pursuant to Paragraph 8 of this Agreement on all shipments CARRIER receives as a result of such back solicitation.

12. CARRIER acknowledges that the BROKER will direct whether matters relating to loss and damage, are to be resolved with BROKER or with BROKER'S customer and that in all instances of freight loss or damage BROKER may represent the interests of its customers. CARRIER shall be liable to BROKER or BROKER'S customer or the owner of the property for loss or damage to such property while in the possession of or under the control of the CARRIER hereunder to the same degree as if the CARRIER were operating as a common CARRIER, subject to 49 U.S.C. 14706.9"Carmack Amendment"). Willful misconduct, gross negligence, or conversion on the part of the CARRIER, its employees, officers, directors or agents shall vitiate all liability limitations contained in this Agreement, if any.

13. In no event shall either party be liable for special, indirect, punitive or consequential damages incurred by the other party even if the non-incurring party has notice of such damages.

14. All claims for loss and damage and any salvage arising there from shall be handled and processed in accordance with 49 C.F.R. Part 1005 (Claim Regulations)

CARRIERS Initials

4

**EXHIBIT C**

COPY







11-Oct-07    03:28pm    From-Cozen O'C    r (NY)    212-908-1302    T-720   P.006/011   F-040

11-Oct-07    03:28pm    From-Cozen O'C    r (NY)    212-908-1302    T-720    P.0C7/011    F-040

COPY

**EXHIBIT D**

20-Nov-07    10:15    From-Cozen O'Connor (NY)    212-908-1302    T-913  P.0077019  F-260



36 Hampton Road
Hewitt, NJ 07421

**(800) 537-2072**
Fax (973) 853-2429

www.atlanticmarineinspections.com

May 2, 2007

Ms. Mary Dewaters
Navigators Insurance Company
One Penn Plaza
New York, New York 10119

**Assured:** Yazaki North America Incorporated
**Carrier:** Timely Integrated Trucking Company
**Date of Shipment:** December 8, 2006
**Trailer Number:** 53138
**Location of Loss:** Edwardsville, Illinois
**Date of Loss:** On or About December 18, 2006
**Type of Loss:** Overturned Tractor Trailer/Damaged Cargo
**Shipment:** 1,489 Wiring Harnesses
**Our Reference Number:** 0601213
**Your File Number:** CAR06-01242

Dear Ms. Dewaters:

This report is to certify that on behalf of Navigators Insurance/AIOI and for the account of whom it may concern, Mr. James Louis and Mr. John Stockman, representative surveyors for Atlantic Marine Inspections, performed a survey inspection and investigation on the above referenced claim.

SHIPMENT INFORMATION

We contacted the assured and requested copies of the delivery receipt, commercial invoice, and packing list.

The subject shipment originated out of Yazaki North America in El Paso, Texas, and was picked up by Timely Integrated Trucking on December 8, 2006 under Bill of Lading 0000166662. The shipment's destination was Yazaki North America in Edwardsville, Illinois.

File 0601213/CAR06-01242          May 3, 2007          Page 2

According to our investigation with the assured, while the trailer was enroute from Texas and in the Illinois area, the tractor trailer overturned and cargo was spewed onto the roadway. As a result, the entire shipment was transloaded at the accident site.

The shipment was loaded into Trailer 53508, owned by RLeasing of El Paso, Texas, and delivered to Yazaki North America in Edwardsville.

The shipment was delivered and signed for on December 22, 2006. Exceptions noted on the bill of lading indicated "wrecked load, Seal 196232 no seal on load." The trailer was not unloaded at the time of delivery due to the condition of the cargo and the assured's request that an inspection be performed at the time of unloading.

Enclosed are copies of the bill of lading.

## INITIAL CONTACTS

Pursuant to your survey request, our office contacted Mr. Mike Soper of Yazaki and advised him of our representation. Mr. Soper advised us to contact Ms. Dawn Boike, Sr. Manager of Logistics for Yazaki.

We left several voice messages for Ms. Boike but were not favored with a return call.

We then contacted Mr. Soper again who instructed us to contact Mr. Matt Ellinghausen, Parts Control Supervisor of Yazaki.

Mr. Ellinghausen stated the reloaded trailer was delivered to their facility in Edwardsville, however, they would not unload it until a representative from our company could be present. He indicated that preliminary indications show the shipment sustained extensive damage.

We advised Mr. Ellinghausen that we would dispatch our surveyor, who will contact him to arrange for an inspection.

## SURVEY INSPECTION

On January 10, 2007, Mr. John Stockman of Atlantic Marine Inspections attended Yazaki North America located at 14 Gateway Commerce Center Drive in Edwardsville, Illinois, and met with Mr. Matt Ellinghausen.

We proceeded to the receiving area of the warehouse where Trailer 53508 was backed into the receiving bay door.

The trailer was marked "RLeasing, El Paso, Texas." The trailer was 53 feet long and constructed of metal. Since this was not the trailer that overturned, there was no visible damage noted.

The rear doors of the trailer were opened and we observed large plastic tote bins stowed three high, two abreast on the trailer floor. The bins were constructed of plastic crating material that was hinged on the short sides to allow better access to the contents. The bottom of each tote bin was formed into a pallet for easy handling with a fork lift truck. The bins measured 64" x 48" x 34" and 48" x 45" x 34". The bins contained coiled automotive wiring harnesses that were positioned on top of cardboard fillers/separators the same size as the interior dimensions of the bin.

Per our request, warehouse employees began to unload the trailer. As bins were unloaded from the trailer, it was apparent that when the cargo was transloaded, the original method of packing was not maintained. Layering of the individual coils of harnesses was lost, and the individual coils were simply piled into the bins. The cardboard spacers used to maintain the integrity of the coiled items and prevent chafing were stacked into several bins with attempt to segregate in accordance with the original load plan.

After the trailer was unloaded, it was determined that it contained 45 of the larger totes and 6 of the smaller totes. Seven totes were found empty while two totes contained only the cardboard spacer sheets.

The following conditions were noted to the harnesses, totes, and spacers.

As indicated, individual wiring harnesses were found to be loosely piled into the bins randomly, rather than stacked atop cardboard spacers for separate layers. The product did not appear to have remained segregated by style or type of harness.

Tote 37LT14A005-JAB – The long side of the tote was bent and vertically creased inward 0-2" over its height. The 5" wide (approximate) plastic corner hinge post on the short side of the tote was broken away over a height of 25" where it abutted the distorted side.

Tote 743T14A005-JND – One of the harnesses found within the bin had the electrical tape winding torn and was apparently frayed from abrasion.

Tote 7L3T14A005-JFB – Found empty with the corner of the tote broken

Tote 7L3T14A005-JPB – The top lip of the long side was chipped and broken over a 1½" x 5" area.

Stacks of cardboard contained within one of the totes appeared to have been wet. The cardboard was damp and slightly discolored.

File 0601213/CAR06-01242          May 3, 2007                    Page 4

After a detailed examination of the subject shipment, it was estimated that
approximately 60 to 70 percent of the harnesses sustained damage and the operable
integrity is questionable.

Enclosed are photographs of the subject shipment.

### DISCUSSIONS

Upon completion of our survey inspection, Mr. Ellinghausen indicated that the only
course to mitigate the loss was to either return the harnesses to the factory to determine
if they are serviceable and/or scrap the entire shipment to prevent potential vehicle
electrical problems. Mr. Ellinghausen explained that the wiring harnesses are used in
automobiles and the Edwardsville facility is not equipped to test the harnesses. A
possible alternative would be to ship it to Yazaki's other facility.

In further discussions with Mr. Ellinghausen, he advised us that quality control
personnel indicated the wiring harnesses were exposed to elements out of their control
and sustained damage. As a result, no wiring harnesses can be guaranteed fully under
the original warranty. Therefore, Yazaki cannot take the risk of distributing the
harnesses to their customers. The only alternative to mitigate the loss would be to
scrap the shipment based on the copper value of the wire.

### REMARKS

In correspondence with Mr. Ellinghausen we were advised that scrap would be
approximately $0.75 per pound for the copper. Based on the assured's estimate, the
scrap value of the shipment would be between $2,000 and $4,000.

We authorized Mr. Ellinghausen to proceed with obtaining scrap value for the shipment
of damaged harnesses. We followed up with Mr. Ellinghausen regarding the final scrap
value and he advised us that as of date of this report, the shipment has not yet been
taken to the scrap dealer because he was waiting for instructions from Navigators. We
advised Mr. Ellinghausen that our email did authorize him to proceed with mitigating the
loss and obtaining scrap value for the shipment.

Once we receive the final scrap value for the shipment of harnesses, we will issue an
addendum report with our comments.

We reviewed the commercial invoice and the subject shipment has a value of
$98,015.69.

**EXHIBIT E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
AIOI INSURANCE COMPANY, as subrogee and          CIVIL ACTION NO.: 1:08-cv-01479-TPG
assignee of YAZAKI NORTH AMERICA, INC.

                         Plaintiff(s),

                 v.

TIMELY INTEGRATED, INC.

                         Defendant(s).          **THIRD PARTY COMPLAINT**

And

LUCKY 7 TRANSPORTATION

                         Third Party Plaintiff(s)

vs.

YAZAKI NORTH AMERICA, INC.

                         Third-Party Defendant

------------------------------------------------------------X


        Third party plaintiff, **LUCKY 7 TRANSPORTATION**, by and through its undersigned counsel,

Schoenfeld Moreland, P.C., sued YAZAKI NORTH AMERICA, INC. and alleges as follows:

                         ## FIRST CAUSE OF ACTION

1.      On or about August 16, 2006, a company by the name of "Integrated Carrier Services" entered

into a Contract of Carriage Transportation Agreement (hereinafter referred to as "Contract of Carriage")

with the third-party plaintiff LUCKY 7 TRANSPORTATION, whereby LUCKY 7

TRANSPORTATION agreed to act as the motor carrier to perform delivery of the cargo/loads brokered

by defendant TIMELY INTEGRATED. Upon information and belief, defendant TIMELY

INTEGRATED and Integrated Carrier Services are affiliated companies.

2.      The aforesaid Contract of Carriage provided that LUCKY 7 TRANSPORTATION shall be liable

to Integrated or Integrated's customers for the owner of the property for "loss or damage to such property

while in the possession of or under the control of LUCKY 7 TRANSPORTATION, subject to the

application of the Carmack Amendment." This Contract of Carriage additionally provides that in no event shall either party be liable for "special, indirect, punitive or consequential damages incurred by the other party," even if the non-incurring party has notice of such damages.

3.      At some point in time prior to December 8, 2006, Integrated Carrier Services and/or TIMELY INTEGRATED retained LUCKY 7 TRANSPORTATION to transport a load of cargo, consisting of wiring harnesses (hereinafter referred to as "the subject-matter cargo"), on behalf of plaintiff YAZAKI NORTH AMERICA, INC. This transportation was performed pursuant to a Bill of Lading.

4.      Upon information and belief, LUCKY 7 TRANSPORTATION picked up the subject-matter cargo from YAZAKI's facility in El Paso, Texas on December 8, 2006 for delivery to YAZAKI's facility in Edwardsville, Illinois. This cargo was being transported via a 1998 Freightliner tractor trailer being operated by driver Rosalba Lopez Quintero. Upon information and belief, while rounding a sharp curve on FM 707 in Jones County, Texas, the vehicle overturned into a ditch, causing damage to the trailer.

5.      Thereafter, upon information and belief, a wrecker service was called to the scene of the accident to reload the cargo into another trailer.

6.      Thereafter, the cargo in question was delivered to YAZAKI's Edwardsville, Illinois facility on or about December 22, 2006. There are several copies of the Bill of Lading in question, one of which is executed with no exceptions.

7.      The cargo in question was apparently not inspected at the time it was signed for and custody and control taken of the cargo by YAZAKI. YAZAKI thereafter retained a surveyor, Atlantic Marine Inspections. Upon information and belief, YAZAKI did not wish to unload the trailer and inspect its contents until the surveyor could be present to attend the unloading and document any damage to the wire harnesses.

8.      The shipment was allegedly delivered and signed for on December 22, 2007 and that exceptions were in fact noted on the Bill of Lading indicating "wrecked load, Seal 196232 no seal on load." Once again, it should be noted that there are several "versions" of the aforesaid Bill of Lading, one which contains these exceptions and one which is signed without exception.

9.      Atlantic Marine allegedly made several unsuccessful attempts to set up a date and time for inspection with YAZAKI's representatives due to YAZAKI's lack of response and inspection was

subsequently conducted on <u>January 10, 2007</u>, some <u>19 days</u> after the trailer was delivered and the load was accepted by YAZAKI. Therefore, the load was in YAZAKI's possession for 19 days before Atlantic Marine viewed its contents.

10.     The report of Atlantic Marine indicates that their inspection of the cargo demonstrated that some of the plastic totes in which the cargo was housed was chipped and broken, some of the cardboard spacers appeared to be "wet and discolored" and that one of the harnesses appeared to be "frayed from abrasion.

11.     On the basis of its "detailed inspection" Atlantic Marine opined that it was estimated that approximately 60 to 70 percent of the harnesses sustained damage and that the "operable integrity" was "questionable." While YAZAKI was cognizant of the fact that the only course of action to be taken to mitigate the loss was to return the harnesses to the factory to determine if they were "serviceable" YAZAKI determined that they did not want to test the harnesses and instead decided to discard the entire load as "scrap."

12.     Upon information and belief, no one from LUCKY 7 TRANSPORTATION was ever contacted and advised that this load was to be scrapped, nor was LUCKY 7 TRANSPORTATION ever advised that the load was rejected due to damage, partial or otherwise.

13.     YAZAKI's counsel subsequently forwarded a notice of intention to make a claim for approximately $98,015.69, representing the alleged value of the load in question.

14.     YAZAKI NORTH AMERICA, INC. was obligated to test the harnesses to determine which of the entire lot were in fact damaged and to provide affirmative proof of the fact that said harnesses were "unusable."     In the event that all of said harnesses were "unusable" and the entire load rendered unusable, YAZAKI NORTH AMERICA was obligated to reject said load and return said cargo to LUCKY 7 TRANSPORTATION in order that proper mitigation of damages take place.

15.     YAZAKI NORTH AMERICA, INC. engaged in a course of conduct constituting failure to surrender property and wrongful and improper destruction of the cargo in question and LUCKY 7 TRANSPORTATION has been damaged thereby.

## SECOND CAUSE OF ACTION

16.    LUCKY 7 TRANSPORTATION repeats and realleges all allegations set forth in paragraphs one through fifteen in the First Cause of Action as if set forth in this, the Second Cause of Action.

17.    The conduct of YAZAKI NORTH AMERICA, INC. in failing to properly secure, hold or retain the allegedly damaged cargo for testing or further analysis and in wrongfully destroying same thereby constitutes a failure to mitigate damages and LUCKY 7 TRANSPORTATION has been damaged thereby.

As to any and all Cross-Claims which may be alleged against the Third-Party plaintiff LUCKY 7 TRANSPORTATION, the following Affirmative Defenses are interposed on behalf of LUCKY 7 TRANSPORTATION:

### AFFIRMATIVE DEFENSES
### FIRST AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a cause of action against third-party Plaintiff LUCKY 7 TRANSPORTATION.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims against the defendant are preempted by the Carmack Amendment to the Interstate Commerce Act.

### THIRD AFFIRMATIVE DEFENSE

Upon information and belief, plaintiff has failed to join indispensable parties.

### FOURTH AFFIRMATIVE DEFENSE

Whatever shipments and/or product received by third-party Plaintiff LUCKY 7 TRANSPORTATION was accepted in accordance with and subject to all the terms and conditions of all applicable contracts, bills of lading, any applicable tariffs and classifications and the rules set forth therein. Third-party plaintiff LUCKY 7 TRANSPORTATION duly performed the terms and conditions

on its part to be performed.  Third-party plaintiff LUCKY 7 TRANSPORTATION claims the benefit of all defenses accorded it by those waybills, bills of lading and other applicable contracts under which the shipment traveled.

### FIFTH  AFFIRMATIVE DEFENSE

Plaintiff has failed to present a claim or suit within the appropriate time limitations required by contract of carriage.

### SIXTH AFFIRMATIVE DEFENSE

The liability of third-party plaintiff  LUCKY 7 TRANSPORTATION,  if any, is limited by the terms of various contracts.

### SEVENTH AFFIRMATIVE DEFENSE

The loss, if any, occurred as a result of an act or default of the shipper or its agent without any intervening act on the part of third-party plaintiff LUCKY 7 TRANSPORTATION.

### EIGHTH AFFIRMATIVE DEFENSE

The loss, if any, occurred as a result of an inherent vice in the cargo, without any intervening act on the part of third-party plaintiff LUCKY 7 TRANSPORTATION.

### NINTH AFFIRMATIVE DEFENSE

Other persons or entities, whether or not parties, each were negligent and such negligence was a proximate cause of the plaintiff's injuries, if any, and should any judgment be awarded to plaintiffs, it must be apportioned among all such negligent persons or entities.

### TENTH AFFIRMATIVE DEFENSE

To the extent that the plaintiff seek recovery for special damages,third-party plaintiff LUCKY 7 TRANSPORTATION is not responsible.

## ELEVENTH AFFIRMATIVE DEFENSE

In the event that the plaintiffs had not or have not title or interest in the shipments that are the subject of this action, then the plaintiffs are not the real party of interest herein and are not entitled to maintain this suit.

## TWELFTH AFFIRMATIVE DEFENSE

Third-party plaintiff LUCKY 7 TRANSPORTATION exercised reasonable care at all times in connection with the shipment alleged in this complaint.third-party plaintiff LUCKY 7 TRANSPORTATION is not responsible for any loss or damage caused by any cause or event which could not be avoided and the consequence which could not be prevented by the exercise of reasonable diligence.

## THIRTEENTH AFFIRMATIVE DEFENSE

Upon information and belief, the plaintiff has failed to mitigate damages.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred under the doctrine of accord and satisfaction.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred under the doctrine of release.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable Statute of Limitations.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred under the doctrine of promissory estoppel.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred under the doctrine of waiver.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred under the doctrine of lack of privity of contract.

### TWENTIETH AFFIRMATIVE DEFENSE

Any damages allegedly sustained by the plaintiffs were caused by the actions of a third party, over whom the said answering defendant exercised no control.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred under the doctrines of laches and estoppel.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred under the doctrine of the Statute of Frauds.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

The third-party plaintiff LUCKY 7 TRANSPORTATION hereby reserves its rights to amend this third-party complaint and/or supplement its Affirmative Defenses in accordance with any additional information developed during the course of discovery.

WHEREFORE, the third-party plaintiff LUCKY 7 TRANSPORTATION does hereby demand Judgment against the plaintiff for the amount of damages as to this third-party complaint, together with interests, attorneys' fees and cost of suit and all other relief which this Court may deem just and proper.

```
                          SCHOENFELD MORELAND, P.C.
                          Attorneys for Third-Party Plaintiff
                          LUCKY 7 TRANSPORTATION
                          By:    __/s/_____
                          ERIC B. SCHOENFELD (ES8532)
                          61 Broadway
                          18th Floor
                          New York, New York 10005
                          (212) 509-0500
                          Our File: PGI-3743-DN1
```

Dated:    June 12, 2008
          New York, New York


TO:       James F. Campise, Esq.
          Nicoletti, Hornig & Sweeney
          88 Pine Street
          7th Floor
          New York, New York 10005
          Attorney for Plaintiff AIOI Insurance Company as Assignee of Yazaki North America, Inc.

          Barry Neil Gutterman, Esq.
          Barry Neil Gutterman & Associates, P.C.
          The Lincoln Building
          60 East 42nd Street
          New York, New York 10165